UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TUONG HOANG,<br><br>        Plaintiff,<br><br>    v.<br><br>CITIBANK, N.A.,,<br><br>        Defendant. | Case No. 23-cv-03270-PCP<br><br>**ORDER RE: CITIBANK'S MOTION TO COMPEL ARBITRATION**<br><br>Re: Dkt. No. 24 |

Defendant Citibank, N.A. seeks to compel arbitration of a dispute over an alleged fraudulent transfer of over $100,000 from plaintiff Tuong Hoang's account. The arbitration provision at issue is part of Citibank's "Client Manual." Citibank does not show or claim that Ms. Huang ever signed a "signature card" agreeing to Citibank's terms comparable to the sample signature card included at the end of the Client Manual. Instead, Citibank says its "custom and practice" was to provide new customers with a copy of the Client Manual when they opened an account. Citibank asks the Court to infer from that statement alone that Ms. Huang was in fact provided a copy of the agreement when she opened her account, and that by then continuing to use her account she implicitly agreed to arbitration. Without more, Citibank's evidence does not establish that Ms. Huang was ever given a copy of the agreement, let alone that she assented to its terms. But the evidence before the Court also does not establish as a matter of law that no agreement was formed. Because the making of the arbitration agreement is in issue, this question must proceed to trial.

**I.    Background**

Ms. Huang alleges that on May 9, 2022, Citibank transferred $104,600—a significant portion of her life savings—from her bank account to an unknown stranger without her consent.

On May 3, 2023, Ms. Huang sued Citibank in state court for violations of the Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq.*, and Section 11204 of the California Commercial Code, as well as for negligence and breach of contract. Citibank removed the case to this Court based on federal question and diversity jurisdiction. Ms. Huang then amended her complaint.

Citibank moved to compel arbitration on August 31, 2023. Citibank asserts that the Client Manual applicable to Ms. Huang's account allows Citibank "to require that any dispute between us, or concerning your … accounts, … be resolved by binding arbitration." Dkt. No. 24-2, at 29.

Philip Adame, the manager of the branch where Ms. Huang opened her account, provided a declaration in support of Citibank's motion to compel arbitration. He states, in relevant part:

> 4. When a customer opens any consumer account at Citibank, it is Citibank's custom and practice to provide the customer a copy of the Citibank Client Manual Consumer Accounts ("Client Manual"). If the customer opens the consumer account at the branch location, they receive a paper copy of the Client Manual.
>
> 5. The Client Manual outlines the various terms and conditions for opening and maintaining a consumer account with Citibank, including an arbitration clause.
>
> 6. Citibank's books and records reflect that in or about November 2012, Plaintiff opened a consumer account with Citibank at the branch located at 2189 Quimby Road, San Jose CA 95122.
>
> 7. As part of Citibank's standard account opening process, Plaintiff received the Client Manual which included a binding arbitration clause. A true and correct copy of the 2012 Citibank Client Manual Consumer Accounts is attached hereto as Exhibit "1" and incorporated herein by reference.
>
> 8. To open the account, Plaintiff was required to agree to certain terms and conditions, including her agreement to be bound by the applicable Client Manual.

Dkt. No. 24-2, at 2. Attached to this declaration is a copy of the Client Manual that Citibank says was in effect when Ms. Huang opened her account. This Manual includes a blank sample signature card which is "signed by customers at account opening." The card states: "By signing below, I … agree to be bound by all Citibank, N.A. terms and conditions applicable to my account." Citibank has not produced a signature card completed by Ms. Huang, nor does it assert she ever signed one.

In response to Citibank's motion to compel, Ms. Huang provided a declaration stating: "I don't remember the process of opening the account, and don't remember if Citibank gave me any

2

documents." She also says that she does not currently have any such documents in her possession.

## II.   Legal Standard

The Federal Arbitration Act provides that a "written provision in … a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "The policy" of this statute "is to make arbitration agreements as enforceable as other contracts, but not more so." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022) (cleaned up). The FAA "requires courts to rigorously enforce agreements to arbitrate," but "it does not require parties to arbitrate when they have not agreed to." *Johnson v. Walmart Inc.*, 57 F.4th 677, 681 (9th Cir. 2023) (cleaned up).

On a motion to compel arbitration, the Court is required to "hear the parties." 9 U.S.C. § 4. The threshold question is whether the parties formed an agreement. If there are no "genuine disputes of material fact as to whether the parties formed an arbitration agreement," the Court may deny the motion or order the parties to arbitration as appropriate. *See Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 672 (9th Cir. 2021). But if the "making of the arbitration agreement" is "in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. A motion to compel arbitration must be held in abeyance until any factual issues are resolved. *Hansen*, 1 F.4th at 672.

The summary judgment standard applies to motions to compel arbitration. *See Hansen*, 1 F.4th at 670. The Court must "give to the opposing party the benefit of all reasonable doubts and inferences." *Sanford v. MemberWorks, Inc.*, 483 F.3d 956, 963 (9th Cir. 2007). If "the existence of an arbitration agreement is at issue," courts use "state-law principles of contract interpretation to decide whether a contractual obligation to arbitrate exists." *Id.* at 681–82. "Although mutual assent is generally a question of fact, whether a certain set of facts is sufficient to establish a contract is a question of law." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 517 (9th Cir. 2023). Ultimately, the Court can only grant or deny a motion to compel arbitration outright if there are no genuine disputes of material fact as to whether an arbitration agreement was formed or not formed. Otherwise, the Court must proceed to trial of the question.

### III. There Is a Genuine Factual Dispute Whether Ms. Huang Agreed to Arbitration.

Citibank argues that Ms. Huang agreed to arbitrate this dispute when she opened her account. Ms. Huang does not dispute that the arbitration provision in the Client Manual would cover her case if it applied. Instead, she argues that Citibank has not met its burden of proving that she entered into this agreement to arbitrate at all. The Court agrees. The question must go to trial.

Under California law, the mutual assent required to form a contract "may be manifested … by conduct," and "acceptance of contract terms may be implied through action or inaction." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (cleaned up). An offeree who knows "an offer has been made" but does not know all of its terms can "be held to have accepted, by … conduct, whatever terms the offer contains." *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 992–93 (Cal. Ct. App. 1972). But when "the offeree does not know that a proposal has been made"—for example, when "inconspicuous" provisions are "contained in a document whose contractual nature is not obvious"—there can be no assent. *See id.*

Here, Citibank does not argue that Ms. Huang signed the arbitration agreement. Instead, it argues that Ms. Huang's "consent to the terms of the Client Manual is … demonstrated by her continued use of her account," and that she "accepted the benefits of her Citibank account by using them for over a decade and thus consented to the terms of the agreement." As a matter of California law, Citibank is correct that Ms. Huang *could* be found to have consented to arbitration without ever signing the Client Manual or even reading or understanding its terms. None of the cases Citibank cites, however, suggests that Ms. Huang could have assented to the terms of the Client Manual without at least being given or sent a copy of the Manual. In several of the cases Citibank relies on, there was no dispute that the party resisting arbitration had at least received the alleged agreement. *See Quiroz v. Cavalry SPV I, LLC*, 217 F. Supp. 3d 1130, 1135 (C.D. Cal. 2016) (concluding that a "signature was not required" to accept arbitration terms where there was "no dispute" that the plaintiff "was mailed the Card Agreement"); *Windsor Mills*, 25 Cal. App. 3d at 996 (declining to enforce an arbitration provision because the documents, which neither side disputed the party resisting arbitration had received, "were not contractual in form and the provision was inconspicuous"); *Bischoff v. DirecTV, Inc.*, 180 F. Supp. 2d 1097, 1101 (2002)

4

1  (enforcing an arbitration agreement DirecTV had mailed to a customer after service had already
2  started, where neither party disputed that the customer had at some point received the agreement).[1]

3        In other cases cited by Citibank the parties disputed whether the party resisting arbitration
4  had in fact received a copy of the alleged agreement. In *Chambers v. Crown Asset Management,*
5  *LLC*, for example, a central dispute was whether the party moving to compel arbitration had
6  sufficiently proven that the agreement at issue had in fact been mailed. 71 Cal. App. 5th 583 (Cal.
7  Ct. App. 2021). While the court recognized that an "arbitration clause within a contract may be
8  binding on a party even if the party never actually read the clause," it made clear that the factual
9  question of whether the agreement had *actually* been sent to the party was "crucial" and a
10 "predicate showing" to establishing assent. *Id.* at 590 n.1, 591, 602. *See also Schwartz v. Comcast*
11 *Corp.*, 256 Fed. App'x 515, 518 (3d Cir. 2007) (considering "evidence of [party's] consistent
12 practice regarding delivery of subscription agreements" to determine whether the other party "was
13 aware that the services he accepted were being offered pursuant to a subscription agreement").

14       Accordingly, before seeking to establish that Ms. Huang assented to the arbitration
15 agreement by her conduct, Citibank must first establish beyond genuine dispute that she was given
16 a copy of the agreement. Citibank offers no direct evidence to establish this. Instead, Citibank
17 asserts that it was its "custom and practice to provide the customer a copy of the Citibank Client
18 Manual" whenever a new customer opened an account at a branch, and that as part of this
19 "standard account opening process," Ms. Huang "received the Client Manual which included a
20 binding arbitration clause." Citibank also submitted a copy of the version of the Client Manual it
21 says was in effect when Ms. Huang opened her account. Ms. Huang, on the other hand, says she
22 does not remember whether she received the Client Manual and does not currently have a copy.

---

[1] Citibank also cites *Knutson v. Sirius XM Radio Inc.*, No. 12-cv-418, 2012 WL 1965337, at *4 (S.D. Cal. May 31, 2012), for the proposition that Ms. Huang could have agreed to the Client Manual's terms by continuing service even if she did not affirmatively assent. But the decision to compel arbitration in *Knutson* was overruled by the Ninth Circuit, which found no assent. *See Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559 (9th Cir. 2014). And in any event, unlike here, there was no dispute in *Knutson* that the alleged agreement had been sent to the party who resisted its enforcement.

1 Citibank claims that this "uncontested proof of Citibank's policies and procedures
2 establishes a presumption that Plaintiff received the Client Manual when she opened her
3 Accounts." Dkt. No. 31, at 6. In support of its argument that its assertions about its custom and
4 practice creates a presumption of receipt, Citibank cites several cases pertaining to mailing. But
5 Citibank's conclusion conflates the two analytical steps of a typical mailbox rule. For example, in
6 the footnote Citibank cites in *Huizar v. Carey*, a case about the "prison mailbox rule," the Ninth
7 Circuit compared several different applications of mailbox rules and explained how in some
8 contexts, mailing automatically establishes the legal effect of receipt, while in others, the
9 presumption of receipt is rebuttable. 273 F.3d 1220, 1223 n.3 (9th Cir. 2001). But either way, the
10 party invoking the mailbox rule *first* has to establish that they actually mailed the document at
11 issue before they can invoke any presumption of receipt. *See also Hagner v. United States*, 285
12 U.S. 427, 430 (1932) ("The rule is well settled that proof that a letter properly directed was placed
13 in a post office creates a presumption that it reached its destination in usual time and was actually
14 received by the person to whom it was addressed.").

15 Citibank cites several cases where courts looked to evidence of regular office procedures to
16 determine whether certain documents were in fact mailed. Evidence of "routine practice" may of
17 course be *relevant* in determining whether an "organization acted in accordance with" its normal
18 practices, including for mailing. *See* Fed. R. Evid. 406. But there is nothing special about evidence
19 of office procedures. For mailings, the presumption of receipt arises not because courts assume
20 businesses always follow their own policies; rather, the "rationale for the presumption of receipt
21 under the mailbox rule is the regularity of successful transmissions in the U.S. Postal Service."
22 *Eddington v. U.S. Dep't of Def.*, 35 F.4th 833, 840 (D.C. Cir. 2022). Citibank may be correct that
23 *if* it had established a presumption of receipt, the fact Ms. Huang did not have a record of
24 receiving the manual would not rebut that presumption. But Citibank says it provided Ms. Huang
25 with the Client Manual directly, not by mail, so no such presumption arises. In a sense, though,
26 this makes Citibank's task easier. The mailbox rule requires two steps: first, proving a document
27 was mailed, and second, presuming (rebuttably) that it was received. But here, Citibank only
28 needs to complete a step analogous to the first: proving that Ms. Huang was given the manual.

6

Citibank's evidence regarding its custom and practice is certainly relevant to whether it can prove that it gave Ms. Huang a copy of the Client Manual. But considering this evidence in the light most favorable to Ms. Huang as required, Citibank has not met its burden of proof. To start, its explanation of its "custom and practice" regarding the Client Manual is cursory at best, and leaves many questions unanswered. At what point in the process do new customers receive the Manual? Are they given a chance to review it before their new account is opened? Are new customers required to sign a signature card like the sample included at the end of the manual, either before or after reviewing the Manual? Are there procedures in place to ensure that these customs are actually followed for each customer? Are there mechanisms to prevent accounts from being opened if these standard procedures are not followed? Citibank points to two out-of-circuit cases where courts looked to evidence of regular office procedures to decide whether certain documents had actually been mailed. Not only do these cases involve documents delivered by mail rather than in person, but both cases also involved descriptions of office procedures that provided much greater detail than Mr. Adame has here. *See Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 814 (2d Cir. 1985) (explaining how "affidavit and deposition testimony" described "four methods" by which both machines and humans "reviewed," "matched," "checked," "metered," "compared," and "verif[ied]" the documents to be mailed in order "to assure proper mailing"); *McCarthy v. Option One Mortg. Corp.*, 362 F.3d 1008, 1012 (7th Cir. 2004) (discussing how evidence of the "detailed procedures followed by [defendant] to ensure the that Handbooks are sent to each borrower" was sufficient to show compliance with a regulation requiring mailing).

Moreover, the Client Manual itself specifies that a "signature card" like the included sample is "signed by customers at account opening." This raises a reasonable inference that part of Citibank's standard practice was to have new customers complete a signature card. But Citibank has not provided a signature card signed by Ms. Huang, nor does it allege that she ever signed one. Ms. Huang argues that the failure to show that she signed the signature card "casts doubt on the degree to which the employee" who opened her account "followed any policy to provide the Client Manual." The Court agrees. Applying the summary judgment standard, Ms. Huang has reasonably disputed whether Citibank followed its own policies (including by providing her with a

7

copy of the Client Manual) when it opened her account. The benefit of that doubt goes to Ms. Huang, and based on the evidence provided, the Court cannot infer beyond reasonable dispute that Citibank followed its usual practice in her case.

That leaves Mr. Adame's declaration that "[a]s part of Citibank's standard account opening process, Plaintiff received the Client Manual which included a binding arbitration clause." Ms. Huang objects to the admission of this paragraph under Federal Rule of Evidence 602, which provides that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." In context, it is not clear whether Mr. Adame's statement is intended as an assertion (1) that Ms. Huang *would* have received a copy of the Client Manual *if* Citibank's custom and practices were followed or, alternatively, (2) that the Citibank records reviewed by Mr. Adame or his own personal recollection suggest that she *did* in fact receive a copy. To the extent this statement is based only on Citibank's custom and practice in 2012 (point 1), it is permissible under Rule 602 because Mr. Adame states that he was employed at Citibank at that time (even if it is not clear whether he was then a Branch Manager), and because he has declared that the statement is of his own personal knowledge. By contrast, if Mr. Adame is asserting that he has direct personal knowledge that Ms. Huang received a copy of the Client Manual (point 2), then his declaration would be inadequate under Rule 602 because it does not suggest that Mr. Adame was present when Ms. Huang opened her account or otherwise has sufficient personal knowledge to testify about Ms. Huang's specific account opening process. Resolving any doubt in Ms. Huang's favor, the Court will construe Mr. Adame's ambiguous declaration as testifying only to Citibank's standard custom and practices. For the reasons already noted, however, this evidence of Citibank's regular procedures fails to establish beyond dispute that Ms. Huang actually received the Client Manual.

In sum, Citibank has not met its burden of proving beyond genuine dispute that Ms. Huang ever received or had access to a copy of the Client Manual—a predicate to proving that she assented to its arbitration provisions. As a result, the Court need not reach the subsequent questions of whether the document itself provided sufficient notice of the existence and contractual nature of the arbitration provision or whether, if Ms. Huang did receive the Manual,

her continued use of the account would have constituted assent to its terms.

The Court cannot compel arbitration under 9 U.S.C. § 4 on the basis of the evidence so far submitted. By the same token, however, the Court also cannot conclude as a matter of law that *no* agreement to arbitrate was entered. Even drawing all inferences in Ms. Huang's favor, it remains possible (if not adequately proven) that Citibank *might* have provided Ms. Huang a copy of the Client Manual when she opened her account. The "making of the arbitration agreement" therefore remains "in issue," and the FAA instructs that in such cases "the court shall proceed summarily to the trial thereof." "To implement this language, once a district court concludes that there are genuine disputes of material fact as to whether the parties formed an arbitration agreement, the court must proceed without delay to a trial on arbitrability and hold any motion to compel arbitration in abeyance until the factual issues have been resolved." *Hansen*, 1 F.4th at 672.

## IV. Conclusion

Citibank has not met its burden of proving that a valid agreement to arbitrate exists. The Court therefore cannot compel arbitration under the FAA. But the evidence also fails to establish as a matter of law that no arbitration agreement was formed. Because there is a genuine dispute of material fact as to whether Ms. Huang was given the Client Manual, and in turn whether she and Citibank formed an agreement to arbitrate, the Court holds Citibank's motion in abeyance and the question must proceed to trial. A Case Management Conference shall be set for January 25, 2024 at 1:00 PM to discuss trial logistics. The parties shall submit an updated joint case management statement reflecting their positions regarding discovery and trial by January 11, 2024.

Additionally, pursuant to the Court's Standing Order for Civil Cases and ADR Local Rule 3-4, the parties are directed to meet and confer to select between Early Neutral Evaluation, Mediation, or Private ADR. The Court will not refer cases for settlement with a magistrate judge unless the parties first attempt one of the other processes. The parties shall file an updated Stipulation and Proposed Order indicating their ADR selection within 14 days of this order.

**IT IS SO ORDERED.**

Dated: November 16, 2023

P. Casey Pitts
United States District Judge